Eleanor K. Leigh, also known as Mrs. Charles Leigh (formerly Eleanor K. Stembler) v. Commissioner.
Leigh v. Commissioner
Docket No. 65656.
United States Tax Court
T.C. Memo 1960-145; 1960 Tax Ct. Memo LEXIS 149; 19 T.C.M. (CCH) 767; T.C.M. (RIA) 60145; June 30, 1960
*149 Petitioner and her then husband opened a joint savings bank account, largely with petitioner's funds, each having the right of withdrawal. Petitioner's intent in beginning the account was to have funds available for future expenses she might incur if she should again suffer from an incapacitating illness. Petitioner's husband over a period of four years withdrew the entire balance and spent a portion of the funds for his own use. Petitioner and her then husband were divorced in 1952. Held, petitioner is not entitled to a deduction for a theft loss for 1952 pursuant to section 23(e) of the Internal Revenue Code of 1939 with respect to the withdrawals of the funds by her husband. Held, further, petitioner has failed to prove either that she was the owner of certain life insurance policies or that she did not authorize her then husband to borrow against such policies, and she is not entitled to a deduction for a theft loss with respect to the resulting loss of the cash value of the policies. Claude C. Pierce, Esq., and George B. Miller, C.P.A., 152 North East 92nd Street, Miami, Fla., for the petitioner. Paul J. Weiss, Jr., Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined a deficiency in petitioner's income tax for the year 1952 in the amount of $5,454.37. One issue has been settled by stipulation, to which effect will be given under Rule 50. The issues for decision are: (1) Whether petitioner is entitled to deduct as a loss from theft pursuant to section 23(e) of the Internal Revenue Code of 1939 the amount of $10,972.85 or any portion thereof allegedly wrongfully converted or embezzled by her husband from a bank account; and (2) Whether petitioner is entitled to deduct as a loss from theft the amount of $2,950 or any part thereof representing the cash surrender value of certain life insurance policies allegedly wrongfully converted by her husband. Findings *151 of Fact The petitioner, an individual, resides in Miami, Florida. Petitioner timely filed her individual income tax return for the calendar year 1952 with the director of internal revenue at Jacksonville, Florida. Petitioner and William Y. Stembler (hereinafter referred to as Stembler) were married in the year 1936, and were divorced in June of 1952. Prior to 1947 or 1948, petitioner suffered from a crippling illness, an acute form of inflammatory rheumatism. During the late 1930's while suffering from such illness, she was incapable of writing checks since her right hand was in splints for a period of more than six months. The illness was recurring, but after that time did not so incapacitate her. In 1947 and 1948, petitioner began to receive a substantial income from certain stocks, and from the retirement of a certain stock. As of August 1949, petitioner had accumulated in a savings account with the Dade Federal Savings & Loan Association of Miami the amount of $3,002.92. This account was closed out on August 2, 1949, and redeposited in a new account in the joint names of petitioner and Stembler. On that day, petitioner deposited in the account the amount of $2,500 representing *152 a dividend check from the Hippodrome Company. At the time of the opening of this account, petitioner intended that the funds in the account were to be withdrawn only for the purpose of taking care of her in the event her illness recurred and she was unable to take care of her responsibilities. Petitioner did not consider Stembler stable with respect to money matters. The bank's ledger card, signed by both petitioner and Stembler, had twice stated on it that the account was held "as joint tenants with right of survivorship and not as tenants in common," and immediately below the signatures appeared the statement: "Either of the above holders may withdraw from this account." Both petitioner and Stembler knew that either of them had the right to make deposits and withdrawals from the account. All deposits and withdrawals subsequent to the deposits made by petitioner, as set forth above, were made by Stembler. However, approximately 80 per cent of the amounts deposited were from the funds of petitioner. The remaining 20 per cent were from funds of Stembler. The total deposits to and withdrawals from the account were as follows: Net In-
With-
crease or
Year
Deposits
drawals
(Decrease)
1949
$ 5,796.49
$ 1,700.00
$4,096.49
1950
3,509.76
4,856.25
(1,346.49)
1951
1,666.60
4,290.00
(2,623.40)
1952
0
126.60
(126.60)
$10,972.85
$10,972.85
0
*153 The joint account was closed on April 10, 1952. Stembler used the withdrawn funds in large part for his own benefit, namely, for food and entertainment and other living expenses. However, with such funds he also purchased nine country club bonds at $150 per bond; one-half of these bonds were given to petitioner upon their divorce in 1952. Stembler also purchased with these funds four stadium bonds at $50 per bond and these bonds were transferred to petitioner upon their divorce. He also purchased a joint annual membership in the Henry Clay Hotel Cabana Club for two years for a total amount of $1,500. This membership was primarily for the benefit of Stembler and not petitioner. Stembler used another $1,200 to make a payment on certain real estate in Coral Gables, Florida, which was held jointly by petitioner and him. Stembler had discussed the deposits and the balance of the account with petitioner but petitioner was not aware of the total amount of his withdrawals until some time in June of 1952. Upon learning that there was no money left in the account, petitioner consulted her attorney who is also her brother and advised him that she wished to institute "whatever steps are necessary *154 to recover this money that I put away in such good faith for a purpose." However, petitioner was advised by her attorney that Stembler was judgment proof and that there was no way in which she could collect the money. Sometime after 1940 three life insurance policies with the Gulf Life Insurance Company of Jacksonville, Florida, were issued on the life of petitioner. Stembler was the named beneficiary of these policies and paid the premiums on the policies from the time they were issued until the divorce in 1952. Sometime between 1940 and 1952, Stembler borrowed the full amount of the loan value of these policies. Petitioner never assigned whatever rights she had under these policies to anyone nor did she ever receive the cash surrender value of these policies. She was first advised by the insurance company in 1952 that there was no available cash surrender value because of the borrowings against them. Petitioner has never instituted any civil proceedings against Stembler to recover any sums allegedly misappropriated nor has she sought to have him criminally prosecuted for any such offense. Neither the withdrawals of the funds by Stembler from the joint savings account nor the *155 borrowings by Stembler against the life insurance policies constituted a "theft" from petitioner during the year 1952 within the meaning of section 23(e) of the Internal Revenue Code of 1939. Opinion Petitioner's contention is that she had a "definite understanding" with Stembler that the funds in the joint savings account, most of which were originally hers, were not to be withdrawn for any purpose other than to cover expenses of any future illness of hers, and that Stembler's breach of that agreement by withdrawing the funds for his own benefit constituted a "theft" within the meaning of section 23(e) of the Internal Revenue Code of 1939. [1]
*156 Respondent contends that it would be legally impossible for Stembler to have stolen funds from the savings account as he was a joint owner with the right of withdrawal, that in any event petitioner has failed to prove any misappropriation of funds from the account, and finally, that even if embezzlement were proven, petitioner would be entitled to deduct only the amount actually withdrawn during the year 1952, namely, $126.60. We agree with respondent. Petitioner has failed to prove the existence of any definite agreement such as is alleged by her to have existed. We have only her testimony in support of her contention, and the facts insofar as they are ascertainable from the record, lead largely to contrary inferences. Petitioner testified that she felt that Stembler was not "very stable" in money matters, yet she set up an account the terms of which expressly made him a joint tenant of the funds and enabled him to withdraw funds at his will. We are not convinced that petitioner was without knowledge of the withdrawals when they occurred. There is sufficient testimony by both petitioner and Stembler indicating that petitioner was informed of at least some of the deposits and *157 withdrawals, that she occasionally made inquiries with respect to whether deposits had been made and the balance of the account, was satisfied with Stembler's answers, and refused to state that Stembler ever lied to her with respect to such inquiries. That petitioner was motivated by the reasons she alleges in setting up the account and that Stembler perhaps took some unfair advantage of her or violated some moral obligation with respect to the account [2] does not negate the terms of the joint account or prove the existence of larceny or embezzlement of the funds. *158 The law of Florida contains no exceptions here material with respect to the rights of joint owners, and the impossibility of a joint owner stealing jointly-held goods to which he has the right of possession. Petitioner has failed to prove that the savings account was not what it purported to be, namely, a joint account, with Stembler having the right of possession to the funds equally with petitioner, and has further failed to prove that Stembler wrongfully converted or embezzled those funds. Petitioner is not entitled to any deduction for a theft loss with respect to the funds of the joint savings account. Grover Tyler, 13 T.C. 186 (1949). Petitioner has failed to prove that she was the "owner" of the life insurance policies. Even if she were, she has failed to prove when the loans were made, or that they were unauthorized by her. Her contention that she suffered a "theft" loss due to Stembler's borrowing against the policies is without merit. Our holding makes it unnecessary to consider respondent's alternative contentions concerning the amount of the alleged theft losses that would be deductible in the year 1952. Decision will be entered under Rule 50. *159 Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(3) of property * * * if the loss arises from * * * other casualty, or from theft. * * * Regulations 118, Sec. 39.23(e)-1. Losses by individuals. * * *
(b) In general losses for which any amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses. * * *↩
2. Petitioner testified on cross-examination as follows: Q. Then why did you open a joint account which gave him complete access to the account? A. To have someone to be able, because I did not turn over my personal account, that is the larger amount, or by dividends, but to have an amount that in emergency he could get to it to take care of my needs, and we had a distinct understanding, a very definite promise, and there wasn't any reason for that account - Q. Wasn't any reason for what? A. For that account to be drawn on. * * *
Q. * * * Let me ask you this, have you ever brought a civil action against your husband to recover this money? A. No, sir. Q. Have you ever made any effort to have criminal proceedings instituted against him? A. Only that I called my brother, who was my attorney, and I said, I was very much upset, and I said I want to take whatever steps are necessary, and if it means jail was the word I used, I said I think this is wrong, I think it is unfair, and I think I have done more than my part, and I don't feel this is right, and I am willing to go to any length.↩